We have one final case today, number 2011-3056, no, I've got the wrong number here, excuse me. Case number 10-1443 in RE STATS. Mr. White. Good afternoon, your honor. May it please the court. For decades, patentees could file a reissue application within two years of the patent's issuance with broader claims and subsequently broaden the claims, change the claims, or make them different. That's exactly what Apple did here, and the PTO has come up with an entirely new theory to reject those claims. Although the theory has shifted a little bit over time, I'll characterize it as this. You can amend claims, you can change claims, you can even broaden claims, but they must be related to or foreseeable from the claims filed on the two-year anniversary. That new theory is not supported by and is inconsistent with the statute, this court's precedent, the PTO's own rules, and several statements in the MPD. The statute does not say that you can only get claims that are related to or foreseeable from the claims you file at the two-year anniversary. This court's precedent has held and repeatedly held that once you put a reissue application on file with broader claims, you can then subsequently change them, broaden them, and alter them. The court set it in Dahl in the 70s, the court set it in Fotland in the 80s, the court set it in Graf in the 90s. Were those cases correctly decided? Yes, Your Honor, I think. Well, first of all, it is the precedent, but yes. I mean, obviously, we're bound as a panel by those cases, but were they correct? Yes, I think the question that was framed pretty squarely in Dahl was, is the statute referring to the claims themselves that have to be filed or is it referring to the application? And, you know, there was a reason for debate at the time, and what they did was they thought it was crystal clear from the words of the statute and from the legislative history that what you apply for is an application, and once you have an application on file, then you can amend or change those claims. So the statute was designed to codify the earlier Supreme Court cases, right? Well, not totally. There was a reissue statute in place in the 1870s, and it was quite different than the reissue statute today. For example, it did not allow broadening expressly. It only allowed narrowing. It did not have a time limit for broadening. It did not provide for intervening rights. So what I think happened was the court began to go into that area and then started to say, well, if we're going to allow broadening, we're going to want some other aspects to it. In what respect wasn't the statute designed to codify the Supreme Court approach? Well, for example, the Supreme Court based its two-year period on the prior – the 102B use period, which at the time was two years, and as we moved forward, that public use could only be for a year, and they didn't change that. The Supreme Court also said you open up a patent, you look on its face, and it's right there is the error, and I don't think that's the way the statute's been interpreted. The statute is similar in some ways, but was never said to codify every single aspect of the Supreme Court cases, and the solicitor doesn't argue for reversal of any of these cases or an entirely separation. What they say is you can get some claims, but they cannot be – they must be related to or foreseeable from the earlier claims. Was this – with the precise set of facts here, was that in any of the other cases, though? Well, the claims were filed in Dahl. The broadened claims were subsequently filed, and the fight was about whether or not those claims had to be unfiled at the two-year period or not. So to the extent those facts are similar, yes. What about the fact that the claims at issue here, that there was never anything in the original patent that contained claims that were directed to this embodiment? Well, that – I don't think that's – first of all, I don't think that's entirely true. But secondly, I don't think it makes a difference. You can file a reissue application. It doesn't say you can only broaden claims that you have filed. It says that you can obtain subject matter that you didn't claim that's disclosed in the specification. So this is clearly disclosed in the specification. Now, as to not claim, it depends how you define it. What this is basically doing is transferring data from A to B without involving the CPU as much as you used to. In one of the sets of embodiments, they say, okay, use these buffer memories, use these intermediate memories, store it, and then you move it. This is basically removing the buffer memories. Right, but there were no claims originally that didn't include the buffers. Right, but there won't be claims in a reissue application, a broad reissue, that are as broad as the claims you're filing by definition. I mean, otherwise you wouldn't be broadening. So one way to look at this is that this was basically transferring data from A to B, and all they're doing is removing the buffers. So to that extent, the claims were related. They were similar to the – they were just saying you don't need the buffers, and you do not. This course is never held, nor did the statute contemplate, that you have to have claims that are in the original patent that you are then amending. In your view, is there any limitation on the ability to – so long as it finds support in the patent and is not new matter, is there any limitation on filing new claims if you put a placeholder in and had a broadening reissue? I don't think we're putting a placeholder in. I mean, that was repeated five times. No, no, no, no. But to the extent you can do it – Except my characterization. To the extent you can – Under your view, you can put a placeholder in, and then as long as you run continuation applications, as long as you find support in the patent, there is never a dedication to the public of the unclaimed subject matter, correct? Well, first of all, there's intervening rights for any subject matter. I understand. Which is a significant difference. But you can do that for any single application on file now. You can put – you can have a patent application of $125,000. The question is the answer. There is no limit, right? Well, there is many more limits than under the continuation practice today. You have to have it two years. You can't recapture. There are different doctrines in the reissue doctrine that apply that don't apply in the regular context. The two-year limit doesn't prevent you from continuing to file new claims which are totally unrelated to the first reissue application claims. No, Your Honor. I don't agree with the totally unrelated. Again, they say it. It doesn't make it true. These aren't totally unrelated. These were very – No, no. I'm not talking about the facts of this case. I'm saying the legal rule for which you're arguing is that once you put in a broadening reissue application, no matter how limited it is, that you are then able, without time limit, to put in another broadening reissue application for an entirely different embodiment. I don't think we're arguing for that proposition. I think we're interpreting this court's case law as it's been done based on two previous challenges where one was you can't even change the claims and two was you can't file a continuation. But the way you're reading our case law is there's no limit. Well, I'm not just reading it that way. You've read it. I'm trying to find out what your position is. Your position is there's no limit, right? Well, my position is that you – if I can – let me try to explain what the limits would be. One, it has to be in the specification as you suggested. Two, there has to be – you would give up entering rights to the invention. And three, think of it this way. There are 100,000 applications right now in the system, let's say, and you can continue them forever until the end of the life of the patent. It's an irregular application. What this is saying is for – of the issued patents, there's only about 1,000 or so reissues. If you file within two years, then those claims – you're putting people on those – those claims can't be changed. Just like any of the current cases can. But for the 99% of the other ones – They can be changed without limitation so long as it's consistent with the specification. Yeah, I think that's right. I think that they can be changed so long – they have to be to the same invention and they, as the statute says, just as 120 allows you to do for a continuation, they can then be subsequently changed. The problem with the PTO test in addition, if you go one step further past the law, is that it would be totally unworkable. They – and this is shown by the shifting of the legal argument from the examiner who talked about the declaration, from the board who talked about the embodiments, to the solicitor who's now talking about unforeseeability. And they change the formulation of the test. It can be unforeseeable, it has to be connected to, it has to be related to. And I don't know what kind of notice that provides to the patentee, to the public, or to anybody. And in this case, we never conceded, and we do not concede that they're totally unrelated. They are basically – what they said was, you can do it this way with buffers, you can do it this way with buffers, and then you can remove the buffers. And this would be no different than if they took the exact same claim and said, we're going to take the buffers out. And that's a broadened issue, and that's what you're allowed to do. You don't think that the board's reliance on the fact that these were different embodiments, and one of which – and as to one of which there were no claims in the original patent, that's not enough of a distinction? What they – no, what they tried – the reason they focused on the embodiments was because they were squarely faced with Dahl. And they thought – they tried to distinguish Dahl to say that was the same embodiment and not – and that we were different embodiments. And then, as we pointed out, both – there's never been a legal distinction of that case ever, and factually they were incorrect. As the solicitor now concedes, the Dahl were two very different embodiments, and that it was not a distinguishing factor. PTA has dropped the embodiment analysis and now moves more towards what's foreseeable and what's not foreseeable. But we did not concede these were not related. There could have been – there was a fourth embodiment in the specification. Patents could have 100 embodiments. And typically what you're doing here is you're just giving a few examples. The claims aren't limited to the embodiments, and they were just shifting the claims and changed these after the two-year period. And for that reason, they are related. And even if you were to adopt the test, like the relatedness test, it would pass. I see a meeting in my room. Questions? I have one more question. Under the Supreme Court cases, like Moore, Bryass, and Webster, whatever the name of the case is, do you think that this practice that your client is engaging in would have been permissible? I think that the continuation practice that exists today is permissible. Yes, this would be permissible. Continuation practice is – Would it have been permissible to file an application limited to one embodiment and then extend it to others many years later? That wouldn't have been laches under the Supreme Court cases. Well, the Supreme Court was interpreting the statute at the time. Well, that's what I'm talking about. Which was a very different statute. Okay, I understand. But take the statute at the time, take the Supreme Court cases. Would this have been permissible under those Supreme Court cases at that time? Well, again, there was no intervening rights. There was no two-year limit. There wasn't this court's precedent. I understand. But try to address the specific question because it's hypothetical. Hypothetically, we're back in the old regime and we're under Miller-Bryass and those other cases. Would it have been permissible to do what is done here under those cases? I don't know. I think that when—I respect the fact that we look at Supreme Court case law to interpret earlier versions of the law. Of course, 112 hasn't changed much. 103 hasn't changed much. That's not the question. Your Honor, you're asking me— Wait, I understand the argument, but I'm asking you a hypothetical. Hypothetically, assume that we're under the earlier regime reflected in Miller-Bryass and those other cases. Would this have been permissible under that regime? I don't—I'm sorry if I can't answer the question. I mean, I think what you're asking me to do is take a court with a different statute 100 years ago without this court's precedent. And that's—I don't—it's not like changing the facts of a case. It's taking an old precedent with a new statute that has been interpreted for 30 or 40 years. It's a different question. You can't answer my question as to how this case would have come out under the Miller-Bryass regime. Well, I think—to be fair, I think that the Supreme Court during that time where there was not an express right to broaden, where there was not intervening rights, would decide things differently than this court has recently and the way this—the new statute has been interpreted. So you're agreeing that under the Miller-Bryass regime, this would not have been permissible? No. What I'm agreeing with is that the statute they applied was quite different than this statute, and so their decisions are not—their decisions were not interpreting this statute, and therefore, they could be different. Okay. Thank you. Mr. Lamar? May it please the Court, Your Honors? To start out, we do believe—the government does believe that 251 and 1952 codified the preexisting judicial doctrine of the two-year limit. If you read the legislative history, which is very short, it expressly says it's a codification of a prior decision, which is referring to a law that was set up by Bridgeport. But that's not all it did, did it? What was that? It's not all it did, did it? I mean, it also was issued in conjunction with 252 to protect intervening rights. In other words, it took the whole picture. That's true. And did a number of things, right? Yes. But specifically, the two-year limit, Your Honor, which was put into Section 251, what was that two-year limit for? If you go back and you read the original case law that led to that, which was the Supreme Court, the Supreme Court said what they were taking into account was when a patent is granted and somebody gets a claim, they claim a certain subject matter, and they don't claim other subject matter that's disclosed, that other subject matter has been dedicated to the public, and the public's entitled to rely on that. That's notice to the public that they're entitled to rely on the unclaimed subject matter. And reissued. That might have been why they decided to pass this statute, but they passed a statute. They didn't say, we're going to say from here on in, whatever that policy is, that's what we want. But I think it's pretty clear if you read the legislative history, there's commentary by P.J. Federico, one of the drafters. There's also expressed statements in the legislative history that say it was a codification of the two-year time limit set up by the prior case law, which was the Supreme Court case law at that time. And just to get back, the purpose of that two-year limit was reissued was supposed to be a rare thing. In other words, you got your patent. We're not going to let you broaden. However, equity said, in these rare circumstances where you've quickly and promptly discovered your error, you're going to come in in a quick fashion, and you're going to come in, and we're going to let you correct it. And we're going to balance the interest of correcting your error with the interest of the public. And modern-day case law, Graff, I believe, says the exact same thing. I think Graff says— So your test is that we're supposed to just say, do we think it protects the public to allow this reissue? Because your test is a bit of a moving target. No. Well, it isn't, Your Honor. Respectfully, what the test is, is Section 251 itself says you need to come in promptly within two years. Now, appellants came in within two years with their initial error. They discovered an error. They came in within two years, like the statute says. They got to broaden it. That issued as a reissued patent. Then they had a continuation, and there were more claims with that continuation reissue, which had more claims germane to that same error, which issued as a reissued patent. Then there was a third application, the second continuation, which is the one that we're fighting about now. And in that application, now there's a new error, an error that they discovered almost eight years after the original patent grant. That new error was never brought to the public's attention within two years. So is it an embodiment test? No. I think in this particular case— Despite the fact that that's what the board said? Well, if you read what the board said in total, Your Honor, they did say in this case you have different embodiments, that this is a different embodiment that you're now drawing claims to that was never before claimed. However, here the embodiments were different enough that one would not have known or had noticed that from the claims that you had in that first embodiment would have led to this. In fact, let me read you— There were two embodiments in Dahl, correct? In Dahl there were two embodiments, yes. However, the embodiments in Dahl were overlapping, and furthermore, as the board distinguished and the examiner distinguished, and we attempted to distinguish in our brief in Dahl, the difference is the error that they discovered within two years, which is what they started to prosecute, and then they later brought in later claims outside the two years, all within the same application. Those later claims, the CCPA, this Court's predecessor, said those claims were covered by the original identification of that error. In other words, the original oath that identified that first error— I still can't understand what your test is, other than I know it when I see it. What is your test? So you're saying it's not different embodiments because sometimes the embodiments could be related? Correct. So what is your test? It's whether or not the error that you discovered within two years covers those claims that you later bring in, which is what the board basically said in Dahl. So we have to look at the original declaration? Well, not just the declaration, because what happens is when someone files a reissue application, they come in with a declaration. They say, here's my error that I discovered promptly within two years, and I want to broaden. And by the way, here's some claims that I want to broaden. So when you look at that collectively, that covers certain subject matter. I can understand how you can look at different declarations and say this declaration clearly is departed from this one. But what criteria are you going to use to determine whether something constitutes a different embodiment? Well, even if it's a different embodiment, Your Honor, arguably, as Appellant has pointed out very well, that in some cases the embodiments can be overlapping and they still could be related subject matter. And Dahl was a prime example of that. Dahl was exactly that situation where you had a first – What is it that you're going to go back to, back to the claims of the original patent? Yeah, you would go back to the within two years, the initial broadening, the initial error that they discovered, the underclaiming error, that's what we're talking about here. The declaration in that application for reissue? And in conjunction with the claims that are submitted. Because just to be clear, when somebody submits a declaration and says I underclaimed, I underclaimed the subject matter, I want to claim it broader, also they bring in claims. Here's the broader claims that I want to submit. So when you look at that collectively, that's the identification within two years of your underclaiming error. Now here, in contrast, let's look at what happened here. Doesn't your argument lead you to say that Dahl was wrongly decided? Well, Your Honor, Dahl is precedent, as appellants pointed out. We understand that. We believe that this case is different than Dahl. Do you think Dahl was correctly decided? Personally, I think Dahl could have been decided more strictly. However, first of all, there's multiple distinctions. Is that a statement that it was wrong? Well, the PTO understands that that's precedent, Your Honor. We do follow Dahl. I understand it's precedent, binding on you, binding on this man. And we follow it. Was it wrongly decided? I think it's a tough question on whether I believe it was wrong. That's why I'm asking. Right, right. I understand. He doesn't ask easy questions. I understand it's a difficult question, Your Honor. If I had it in front of me today, I would argue not to decide it that way if it was here today. If we were arguing that, if it was 1971 right now and we were arguing about the Dahl situation, I as a PTO representative would have argued against it being decided that way. But the PTO lost that argument. We lost. But my problem is it seems to me that you can find support in the early Supreme Court cases for Dahl being wrongly decided, but I find it very difficult to find in those earlier Supreme Court cases any support, whatever, for the distinction that the board made here. Well, here's the way I see it, Your Honor. The early Supreme Court cases say figure out what your error is, your underclaiming error is within two years. Do it quickly. Don't come eight, nine, ten years later and come up with some new error. Here there's more than one error. Here they did do that with their first error. They figured out their first error within two years. They broadened it. We permitted that. Now they've come up with another error, an error that they didn't even know about or didn't tell us about within two years. They waited eight years to tell us about it. That ought not be able to be broadened in an issued patent. That's the problem that we have with what's going on in this case. In this case, the Supreme Court case law, which these principles, we believe, still exist within the statute, and we think a process of expansion carried on indefinitely without regard to lapse of time would operate most unjustly against the public and is totally unauthorized by the law. In such a case, even he who has rights and sleeps upon them justly loses them. What they're saying is the public has a right to have some reliance on the certainty and the fixed scope of the patent. When those statements were made, there was no intervening rights protection. That's correct. So isn't there a balance here between— No, because even when intervening rights were established in 1940 in the Sontag case, the Supreme Court, again, still acknowledged that same exact doctrine for the bar requirement. In other words, there are two protections here. One protection is effectively a statutory bar. If you wait longer than two years to discover your error, it's been dedicated to the public. You can't pull it back. You can't take back what you've already given to the public if you wait longer than two years. That's the rule. Intervening rights came along in Sontag, and yeah, let's say— Intervening rights came before the 1952 statute. Correct. It was a judicial creation. Yeah, Sontag, Supreme Court Sontag. I can give you the site. It's in our brief. It was prior to 1952, and it was subsequently codified. Not identically, but subsequently codified. The bottom line is they protect separate—well, they have overlapping protections, but they're not identical. And if intervening rights solved all the problems, why would Congress leave the two-year bar in the statute? They did because intervening rights doesn't solve all the problems. Intervening rights doesn't promote prompt coming forward with your error within two years, but the two-year limit does. The two-year limit's there for a reason. Let me ask you to go back to your test again. You've sort of avoided using words like unforeseeable here, and yet you use them in your brief. Yes. Are you moving away from that test? No. I think all the words—the appellant's pointed out there's been multiple words used to try to describe this. Right, and you come up with sort of a new one here. Well, and I think the examiner said—he said it wasn't covered by the oath, but he also used the word it was totally unrelated to the earlier subject matter that he claimed. So the examiner was consistent. The board then came and said— How is something totally unrelated to a subject matter if it comes out of the same specification? Huh. We gave a nice example in the back of our brief, Your Honor. If this were permitted, if this is the law, if this is the interpretation of the law, and someone can simply just get their foot in the door and declare any error that they happen to stumble upon and then just keep filing continuations effectively for the whole life of the patent, the patent is never fixed. That would completely undermine and completely contradict the doctrine that was set up by the Supreme Court in the Miller v. Bridgeport Brass case. Therefore, we don't think it's possible to construe the statute this way, to permit someone to just keep filing and filing and filing and extending the length of time in which they could broaden claims in an issued patent. We're not talking about an application. As they pointed out in the continuation practice, 120 allows you to file continuations, and arguably in some instances you could kind of do this through an application. But your own regulations have basically said repeatedly that you can do this. I don't think that's true. And now you're saying you want to interpret your own regs narrowly. Well, our regs don't—the argument is the MPEP, says Your Honor respectfully. But if you look at the MPEP provision, we don't dispute that it could have been written better. We don't dispute that there's a way to read it broad enough to say this is okay. However, our point is I think the MPEP provision was really just to say what happened in Dahl is okay, but not what's happening here. We think this goes further than Dahl. We think this is beyond what happened in Dahl. And here, a newly discovered error, eight years after the patent grant, should not be permitted to get back in and broadened in an issued patent. That's the problem. How often does this problem come up? Well, as far as I know, Your Honor, in the record, appellants cited a case called Buell where they tell us, oh, in the Buell case— I'm asking at the patent office. How often do you run into the Dahl situation? How often do you run into a situation where somebody files a single broadening reissue application and then seeks to cover additional embodiments and other things later on? Are we dealing with a one-off situation? No, I think it has happened before. There might be cases in the pipeline where it's potentially happening. There are two cases that I'm aware of that are documented. One appellant has cited the Buell case where, in that case, he said, hey, the board actually permitted this before. But if you look closely at that case, it was actually later claims drawn to the same inventive subject matter, which we point out is distinguishable, makes it more similar to Dahl. Another case that we're aware of, the examiner and the board mentioned in the transcript— I'm not asking for things that ended up with board decisions or court cases. I'm just saying, do you have a sense of how often this comes up during the examination process? Unfortunately, I don't know that it comes up very often. I mean, I know that it's happened more than once, but I don't know that it's happened very often. I can't say. However, I know if this case comes out and says that this construction is correct, that will be an incentive for patent owners to use this as a strategy, which is what we think shouldn't be allowed. We think that that—we're here to protect the public, and that's why we made this rejection. That's why the agency did this. And think of it this way. If this court affirms their construction of the statute, tomorrow they could run down to the PTO, file another continuation, and think up another error, and continue to broaden that claim again in that same issued patent. It seems to me, though, that that advances innovation, and that encourages creativity by the inventors, ongoing creativity. If we were to adopt the PTO's determination, what would that do to innovation within the American patent system? In fact, Your Honor, I would argue it's the exact opposite. If you adopt the PTO's construction, we would encourage innovation by doing that. If you adopt this construction, you would discourage innovation, because what happens here is the public then becomes deprived of the adequate notice that the issued patent provides. That issued patent is supposed to provide to the public, here's the scope of the property right. Everything else has been dedicated, and I'm free to use it. But if you start to blur that and put more doubt into the public's mind as, well, how do I know, when will this be broadened later downstream, because they'll be able to do it potentially for the life of the patent under this theory. So in our view, it actually would discourage innovation, Your Honor, and if you were to affirm the PTO's construction, that would actually strengthen the patent system, which ultimately would encourage innovation, Your Honor. So I don't have anything further unless you have more questions, Your Honor. I think that's it. Thank you for your time. Mr. Weyl, I'm going to give you two minutes. Thank you, Your Honor. Three quick points. One, Can you first answer, do you agree that Buol does not really support your position? Well, I think Buol is a board decision where it came up, and we cited it in our brief as they have allowed this in the past, but it's not binding on this court, so we have looked to this court's precedent. Do you agree it's factually distinguishable? No. I mean, every time they want to distinguish something, they say it's related or unrelated, and that was never analyzed. In that case, it wasn't analyzed at all. I mean, it said it was fine that they did it, and every time they go back, they try to distinguish the facts, which were not relied on by anybody. And, you know, as your colleague we had, how related is related? In our case, it was right in the spec. Three quick points. The error, it says we only have to indicate one error. It used to say we had to indicate all the errors. Based on their new test, we'd have to indicate every error up front that's unrelated, so we could then complain about it. But you're not suggesting that the MPEP is entitled to Chevron debt? I didn't say that, Your Honor. I didn't think you did. He was saying it was the rules. So what difference does it make? Well, the rules are a little different than the MPEP. He said it was just the MPEP. There are two aspects of the rules that say we can do this. A, and then if you look at 175F, it says in a continuation, you actually have to file a declaration with a different error. A different error. It can't be the same error, and that's at 46A of the addendum. It's 1.175. So it says you have to have a different error. By definition, if you're claiming more, if you're broadening, and it has to be in the specification, you're claiming stuff that you didn't claim earlier. You didn't dedicate it to the public. It lets you do it. And the last point is stare decisis. This precedent is from 1970. This has been 40 years. It's a statutory construction question. Congress has amended the statute multiple times. They're doing so as we speak. They have not suggested this change. They have not asked for public comment. Nobody has suggested this. And all we did was rely on this. If they're going to do it, they should do it as they did with the TAFAS rules, prospectively, noticing comment, and give everybody an opportunity to at least discuss it. Is it a problem? And how to fix it. Could they fix it by notice and comment rulemaking? Well, I would suggest that it is the right procedure, and it would be challenged in a TAFAS-type environment if people didn't like it. But to have us, to have a company that simply followed the rules, that did exactly what they said they could do, is not trying to abuse the system here. I mean, Apple, I think, is an innovator. And there's intervening rights for all the people out there that write these letters. Yeah, but those intervening rights are pretty limited. It's not true. Not true. Now, don't interrupt me. I'm sorry. It only covers things that were produced up to the date of the reissue. And then you've got, for the future, you've got to find equitable intervening rights, right? I apologize for interrupting. That is correct. But it's a huge, I mean, one of the problems the Supreme Court was having was, what this doctrine was, there were no intervening rights. It's not to suggest that you couldn't give prospective intervening rights to somebody. And there's been no prejudice here. In the Lachey's cases, the recent cancer research case, the court determined that for prosecution in history of Lachey's there has to be some prejudice. There's been no prejudice here. And so we simply follow the process, and the rules keep shifting, and all we ask is that the court reverse the board decision. Okay. Thank you very much. Thank you. Thank you, Your Honor. Thank you both counsel. The case is submitted.